IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| MOHAMED A. ALY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:26-cv-426 (LMB/LRV) |
| | ) | |
| JEFFREY CRAWFORD, et al., | ) | |
| | ) | |
| Respondents. | ) | |

## ORDER

Petitioner Mohamed A. Aly ("Aly"), a native of Egypt, has filed a three-count Petition

for Writ of Habeas Corpus ("Petition") under 28 U.S.C. § 2241, in which he asserts that he has

been illegally detained by the U.S. Department of Homeland Security's ("DHS") Immigration

and Customs Enforcement ("ICE") agency. Specifically, he alleges that his detention is unlawful

under Zadvydas v. Davis (Count I), violates procedural due process (Count II), and contravenes

the Immigration and Nationality Act and the Administrative Procedure Act (Count III).

Aly is currently detained at the Farmville Detention Center, which is within this Court's

jurisdiction and the basis upon which he is suing Jeffrey Crawford, the warden of the Farmville

Detention Center. Aly has also sued Russell Hott, the Director of ICE's Washington Field

Office; Todd M. Lyons, the Acting Director of ICE; and Kristi Noem, the DHS Secretary

(collectively, "the federal respondents"). For the reasons stated in open court, and for the

reasons further discussed in this Order, the Court finds that Aly's continued detention is unlawful

under Zadvydas and thus violates the Fifth Amendment. Accordingly, his Petition will be

granted as to Count I, and the federal respondents will be ordered to release him from custody

immediately.

I.

According to the Petition, Aly entered the United States on or about October 18, 1992, when he was 10 years old. [Dkt. No. 1] at ¶ 15. On November 25, 1995, he adjusted his status to that of a lawful permanent resident. Id. ¶ 16. In October 2008, Aly was arrested "after law enforcement found one ounce of cocaine in his possession." Id. ¶ 17. He pled guilty in New Jersey Superior Court and was sentenced to three years of incarceration. Id. In April 2012, Aly was "paroled, transferred to ICE custody, [] placed into removal proceedings," and detained for the duration of those proceedings. Id. ¶ 18. On August 12, 2013, an Immigration Judge ordered that Aly be removed to Egypt, and that order became final on October 10, 2013. Id.

After the removal order became final, Aly remained in ICE detention as ICE attempted to obtain travel documents from the Egyptian consulate in New York; however, the Egyptian consulate "refused to issue travel documents because [Aly's] Egyptian citizenship could not be verified." Id. ¶ 19. On or about April 17, 2014, Aly was released from ICE custody pursuant to an Order of Supervision. Id. ¶ 20. Since his release, Aly has complied with all conditions set forth in the Order of Supervision. Id. ¶ 21. Additionally, he has not been arrested for or charged with any crime, and he has obtained work authorization pursuant to 8 U.S.C. § 1231(a)(7). Id. ¶¶ 22, 24. Before being re-detained, Aly worked at an apartment complex in New Jersey and was responsible for overseeing maintenance operations at various facilities. Id. ¶ 24. He also has a wife, two U.S. citizen children, and two stepchildren. Id. ¶ 25. During this time, ICE has made "multiple attempts to obtain travel documents for [Aly] from the Egyptian consulate," but the Egyptian consulate has consistently "refused to issue travel documents because [Aly's] Egyptian citizenship could not be verified." Id. ¶ 23.

On August 1, 2025, Aly reported for a routine check-in with ICE in Newark, New Jersey. Id. ¶ 26. At the check-in, ICE took Aly into custody and told him "that they were re-detaining

2

him as a result of the new administration's policies." Id. Aly was initially held at a detention facility in New Jersey before he was transferred to the Farmville Detention Center. Id. ¶ 27.

On October 24, 2025, ICE issued a Decision to Continue Detention, explaining that "ICE has determined to maintain [Aly's] custody" because Aly "ha[d] not demonstrated that, if released, [he] will not . . . [p]ose a danger to the community, to the safety of other persons, or to property." [Dkt. No. 10-1] at 6. On January 28, 2026, ICE issued another Decision to Continue Detention, which justified Aly's detention on the ground that "ICE is actively working with the Government of Egypt to procure a travel document on your behalf." Id. at 9.

Aly filed his Petition on February 13, 2026. [Dkt. No. 1]. The Court subsequently entered an Order requiring that Aly not be "removed or transferred from this district for any reason without this Court's permission" and directing the federal respondents to show cause why the Petition should not be granted. [Dkt. No. 2]. The federal respondents filed an opposition, [Dkt. No. 10], and the Court heard oral argument on February 20, 2026.

## II.

The detention and removal of noncitizens following final orders of removal is governed by 8 U.S.C. § 1231. Under § 1231(a), DHS "shall detain" and physically remove noncitizens from the United States during a 90-day "removal period." That period commences upon one of three events: (i) the date the order of removal becomes administratively final; (ii) if the removal order is judicially reviewed and if a court stays removal, the date of the court's final order; or (iii) if the noncitizen is detained or confined (except under an immigration process), the date the noncitizen is released. 8 U.S.C. §1231(a)(1)(B). After the 90-day deadline, DHS may release a noncitizen subject to terms of supervision. Id. § 1231(a)(6). DHS may also continue to detain a noncitizen in certain circumstances, including where the noncitizen is inadmissible or DHS determines that the noncitizen is "a risk to the community or unlikely to comply with the order of

3

removal." Id. "[I]n authorizing such post-removal-period detention, the statute does not specify a time limit on how long DHS may detain an alien in the post-removal period." Castaneda v. Perry, 95 F.4th 750, 756 (4th Cir. 2024) (cleaned up).

The Supreme Court, however, has recognized that "serious constitutional concerns" would arise if § 1231 were interpreted to allow for "indefinite detention." Zadvydas v. Davis, 533 U.S. 678, 682 (2001). Thus, in Zadvydas, the Supreme Court construed the statute to contain an implicit limit on terms of detention, "the application of which is subject to federal-court review." Id. Under Zadvydas, a noncitizen's detention pursuant to § 1231 is presumptively unlawful and violates due process if his detention extends for more than six months and the petitioner "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." Id. at 701. If a petitioner makes that showing, the burden shifts to the government to rebut that showing. Id. "[A]s the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." Id.

The federal respondents concede, as they must, that Aly has been detained for more than six months.[1] [Dkt. No. 10] at 5. The question therefore becomes whether Aly has provided good reason to find that there is no significant likelihood of his removal in the reasonably foreseeable future. Zadvydas, 533 U.S. at 701. Aly has met this burden by persuasively arguing that no one—including DHS—has been able to secure proper travel documents for Aly to be deported to Egypt despite over 12 years of trying. [Dkt. No. 1] at ¶ 57.

---

[1] After the removal order became final, Aly was detained for six months and seven days, until April 17, 2014. [Dkt. No. 1] at ¶ 20. Aly was then re-detained on August 1, 2025 and, as of February 20, 2026, has been detained for six months and 19 days.

4

In attempting to rebut this showing, the federal respondents claim that DHS is "actively working with the Egyptian government to secure a travel document" for Aly. [Dkt. No. 10] at 6. They explain that on October 3, 2025, ICE requested travel documents from the Egyptian government, and the Consular General responded by asking for documentation regarding Aly's criminal record. [Dkt. No. 10-1] at ¶ 9. They also point to the Consular General's verification of Aly's "identity and nationality" on November 3, 2025 but concede that local authorities still have been "unable to independently to [sic] locate any records" for Aly. Id. ¶ 11. According to the federal respondents, because they have been slowly but actively trying to deport Aly, "his continued detention is in accord with due process under Zadvydas." [Dkt. No. 10] at 6.

There are many problems with the federal respondents' assertion that there is a high likelihood of deportation in the foreseeable future because DHS is working on obtaining travel documentation from Egypt. First, although the federal respondents seem optimistic that they will be able to obtain the proper documents in the near future, they have not attached even a scintilla of real evidence to support the claim that Egyptian authorities have verified Aly's nationality or that they have expressed a willingness to receive him. Second, the indeterminate assertion that DHS is working with Egyptian authorities to procure travel documents is drastically insufficient to demonstrate that there is any likelihood that Aly will be removed in the foreseeable future.[2] Accord Singh v. Gonzales, 448 F. Supp. 2d 1214, 1220 (W.D. Wash. 2006); Xiao v. Noem, et al., 1:25-cv-2382-MSN-IDD, Dkt. No. 10, at 7 (E.D. Va. Jan. 30, 2026). Third, the contention

---

[2] The federal respondents' citation to the Report and Recommendation in Mattete v. Loiselle, 2007 WL 3223304, at *4 (E.D. Va. Oct. 26, 2007), for the proposition that a country's failure to grant travel documents for a petitioner "does not prove that a petitioner has no reasonable likelihood of being removed" is inapposite. In Mattete, the petitioner's only evidence that his removal was unlikely was a declaration from his attorney stating that he had overheard officers at two consulates say that they would not issue the petitioner travel documents. Id. Moreover, the petitioner was deported while his objections to the Report and Recommendation were still pending. Id. at *2. Accordingly, Mattete is unpersuasive.

that DHS's request for documents makes deportation foreseeable is particularly concerning given that the government has not been able to procure travel documents to effectuate Aly's removal for over 12 years. See Douglas v. Baker, 2025 WL 2997585, at *4 (D. Md. Oct. 24, 2025); Zavvar v. Scott, 2025 WL 2592543, at *7 (D. Md. Sept. 8, 2025).

In the alternative, the federal respondents argue that if they are unable to secure the proper travel documentation, Aly "will be nominated for an upcoming charter flight to Egypt in March 2026." [Dkt. No. 10-1] at ¶ 23. This representation is remarkably deficient. As an initial matter, the federal respondents have not explained how Aly could be placed on a charter flight to Egypt and allowed into Egypt without proper travel documents. See Yu v. Noem, 2026 WL 352840, at *3 (W.D. Mich. Feb. 9, 2026) (noting that the government was unable to "effect removal on a special charter flight" to China without proper travel documentation); Lambert v. Garland, 2023 WL 2016841, at *2 (S.D. Fla. Feb. 15, 2023) (stating that the petitioner was "taken off" of a removal charter flight to Jamaica because the Jamaican consulate did not issue a travel document). Moreover, the federal respondents have not cited to a single statute or regulation that permits them to place a noncitizen on a charter flight to a foreign country without proper travel documentation. Nor have they provided any information about the purported charter flight other than that it may occur in March 2026.[3] These representations are insufficient to rebut Aly's claim that his imminent removal is unlikely. Accord S.F. v. Bostock, 2025 WL 2841022, at *4 (D. Or. Oct. 7, 2025) (finding "the mere possibility of a scheduled charter flight to Iran in lieu of a travel document" is "speculative" and "insufficient to rebut Petitioner's showing that removal is not significantly likely within the reasonably foreseeable future").

---

[3] At oral argument, counsel for the federal respondents indicated that she did not have any information regarding the purported charter flight, and that ICE was unwilling to provide this information for security reasons.

6

In sum, the government may not, as it has here, "detain a noncitizen and then sit on its hands." Douglas, 2025 WL 2997585, at *5. "Such inaction, or lack of progress in effectuating removal, is precisely what Zadvydas forbids." Id. Aly is thus entitled under Zadvydas to issuance of a writ of habeas corpus and immediate release.

III.

For the reasons stated above, the Court finds that Aly's continued detention is unlawful under Zadvydas and violates his due process rights. Accordingly, the Petition, [Dkt. No. 1] is GRANTED as to Count I, and it is hereby

ORDERED that the federal respondents release Aly, with all his personal property, by 3:00 PM on Friday, February 20, 2026 pursuant to the Order of Supervision under which Aly was released on April 7, 2014; and it is further

ORDERED that the federal respondents—along with their officers, agents, servants, employees, attorneys, successors, and assigns, and all persons acting in concert with them—be and are ENJOINED from rearresting Aly except upon a concrete showing of imminent removal to a qualifying, consenting country.

The Clerk is directed to enter judgment in Aly's favor pursuant to Federal Rule of Civil Procedure 58, forward a copy of this Order to counsel of record, and close this civil action.

Entered this 20 day of February, 2026.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge